================================================================
This opinion is uncorrected and subject to revision before
publication in the New York Reports.
----------------------------------------------------------------
No. 26
The People &c.,
           Respondent,
        v.
Lee Carr,
           Appellant.
-----------------------
No. 27
The People &c.,
           Respondent,
        v.
Walter Cates, Sr.,
           Appellant.


Case No. 26:
        Andrew C. Fine, for appellant.
        Melanie A. Sarver, for respondent.


Case No. 27:
        Bruce D. Austern, for appellant.
        Melanie A. Sarver, for respondent.




LIPPMAN, Chief Judge:

        The primary issue presented by these appeals is whether

the court violated defendants' right to counsel by holding an in

camera proceeding without counsel present to discuss with the

- 1 -

People's main witness the witness's mental and physical ability to testify. Because, under these facts, the witness's mental and physical health were inextricably tied to his credibility, a nonministerial issue for trial, we hold that the court violated defendants' right to counsel by denying defense counsel access to the proceeding.

Codefendants Lee Carr and Walter Cates, Sr., were convicted of second-degree murder for acting in concert with three others to kill Matharr Cham, who was beaten and strangled. It was Gary Rose who was the People's main witness. For thirty years, Rose had been a regular user of crack cocaine and methadone, and he leased the apartment where the murder took place. At trial, Rose testified that he was in the apartment when Carr and Cates, Sr., beat Cham, strangled him, and placed his body in the bathtub; that defendant Carr told him to stay in his room; that he dozed off before hearing muffled sounds in the other room where Cham had been sitting, and later saw Cham's body in the bathtub with an extension cord tied around his neck.[*] Carr and Cates, Sr., contended that the others had killed Cham.

During trial, Rose failed to appear twice, first on April 22, 2009, and again on April 27, 2009. The first time, Rose appeared after trial was adjourned and the People sent investigators to look for him. The court questioned him in

---

[*] Surveillance video shows Cates, Sr. helping to dispose of the body.

camera to determine why he was late.  The substance of that first discussion is mostly unknown.  Defense attorneys requested that they be present during any potential, future proceeding with the witness to discuss the reasons for Mr. Rose's failure to appear, that any records of medical attention given to the witness be disclosed because of the witness's history of abusing drugs, and that the proceedings be transcribed.  Instead, after Gary Rose failed to appear the second time, the court held an in camera, off-the-record discussion with the witness to ascertain the extent of the witness's illness and when he would be able to testify.  Supreme Court relayed the discussion to defense counsel, stating that the witness was "in bad shape," that he was suffering from a migraine and needed a half day to recover, and that he denied he was suffering from alcohol abuse or affected by crack cocaine, stating:

> THE COURT:  For the record, on Wednesday shortly after I dismissed the juries, we got word that Mr. Gary Rose, who was supposed to be here first thing Wednesday, arrived . . . I asked the People to have him brought over here to find out why he was late . . . He seemed to be in bad shape . . .  This morning, I've received a phone call from [the prosecutor] stating that although Mr. Rose was here, he was in no condition to testify. We had a discussion among the DA and the defense lawyers at the bench.  I've instructed everyone that I was going to speak to him in camera which I did off the record . . . this morning.  He informed me that he suffers from migraines [and] that he needed a half a day to recover.  And I asked him if he was on drugs.  He said, no.  I asked him if he was suffering from any alcohol problem. He said, no.  I asked him if he's on crack.

He said, no.  And he said he would be ready to go tomorrow . . .

[WALTER CATES' COUNSEL]: . . . I think the Court agrees that there was an [sic] unanimous decision of the three defense lawyers that we wish[ed] to be present with our clients when the Court did the inquiry of Mr. Rose.  When that was denied, we wish[ed] that the inquiry by the Court go on the record which was also denied.  This was a request before the Court conducted the independent inquiry . . . We were made aware today of the Court's inquiry from Wednesday. If that was on the record, as well, we would like copies of that transcript . . . We would like to know what excuses he gave for not showing up on that day . . . Mr. Rose indicated he was a regular user of Methadone and a regular user of crack cocaine.

Carr's counsel joined in the objection, after which Supreme Court responded:

THE COURT: . . . I don't think there is any legal requirement for my discussions with him on . . . Wednesday or today to be on the record.  Obviously, defense counsel will . . . have a full range of cross examination. They can cross why he wasn't here . . . the jury is going to find out that we've been sitting around waiting for him.

. . .

[WALTER CATES'S COUNSEL]:  The District Attorney argues . . . that the fact that he's not present is irrelevant to us . . . the People want to say that he was just late. . . . I dispute their characterization of that. . . .

THE COURT:  Again, you can cross.

[WALTER CATES'S COUNSEL]:  I don't know anything about it . . .  The District Attorney's office interviewed him.  The Court spoke to him.  I have no records of either of this.  If he gets on the stand and says

something different from either what he told them or told you . . . Only the Court would know and only the DA's Office will know . . .

THE COURT:  Yeah.  But I told you that he [had] a . . . migraine.  And he needed 12 hours to recover . . . He also said he was not on any drugs or alcohol today.

[WALTER CATES'S COUNSEL]:  Did he say last Wednesday he had a migraine?

THE COURT:  . . . I didn't ask him about his physical condition last Wednesday.

[WALTER CATES'S COUNSEL]:  In the Court's opinion, this morning, you thought last Wednesday . . . he looked worse[?]  Did he look tired?

THE COURT:  He looked tired, disheveled and much more hyper than he is today.

[WALTER CATES'S COUNSEL]:  Like someone who might be withdrawing from Methadone?

THE COURT:  I can't say . . . It's not fair for me to say."

The Appellate Division affirmed defendant Carr's conviction, discounting the significance of the in camera proceeding involving Gary Rose.  It concluded that it "was not a hearing, nor part of the trial, and it did not involve the determination of any issue requiring input from defendant or his counsel" (People v Carr, 111 AD3d 472, 472 [1st Dept 2013]).  The Court found that defendant Carr was not prejudiced by the conference being unrecorded nor was he impaired in his "ability to cross-examine this witness about all matters relating to his credibility, including drug abuse" (id.).  Therefore defendant's right to counsel was not violated (id.).  The Appellate Division

separately affirmed Cates's conviction (People v Cates, 92 AD3d 553 [1st Dept 2012]).

A Judge of this Court granted leave to appeal (23 NY3d 1019 [2014]; 22 NY3d 1155 [2014]) and we now reverse the orders in each case and remit for new trials.

Absent a substantial justification, courts must not examine witnesses about nonministerial matters in camera without counsel present or ex parte (see People v Contreras, 12 NY3d 268, 273 [2009]; People v Goggins, 34 NY2d 163, 173 [1974]). "[A]n *in-camera* examination of the witnesses, that is ex parte or without the parties represented would, in our view, arguably trifle with the constitutional right to confrontation and the right to counsel" (Goggins, 34 NY2d at 169). A "defendant's right to the full benefit of the adversary system should not be denied, nor qualified by impairing his right by interposing the 'neutral' Judge to assess whether the disclosure is relevant or material" (id.). Goggins concerned a defendant's right to disclosure of an informant's identity, and this Court held that where the information "relates to a substantive issue in the case, the disclosure should not be ex parte or without either party present even if *in camera*" (id. at 173).

"[E]x parte proceedings are undesirable, and they should be rare" (Contreras, 12 NY3d at 273). In Contreras, an ex parte proceeding was substantially justified during the court's review of a rape victim's notes that described an erotic

relationship the victim was having with someone other than the defendant, the victim's husband (see id. at 271). Because of the inflammatory and private nature of the notes, and the fact that they would likely fall under the protection of the Rape Shield Law, the court held an ex parte proceeding to determine first if they were Rosario or Brady material, during which the court confirmed the notes were irrelevant (see id.). After finding that the victim "might have been warranted in fearing worse than embarrassment if the contents of the document had been communicated to defendant" because the notes revealed a romantic relationship with another man, the "initial consideration of the question must be ex parte, almost by its nature" as "the court can hardly disclose the document before deciding whether to order it disclosed" (id. at 273). There, the "hearing was not only noncritical, but, as a matter of law, unnecessary," and thus the ex parte nature of the proceeding was both justified by the irrelevant information discussed and by the safety concerns of the victim (id.).

In People v Frost, the court excluded defense counsel from a pretrial hearing to decide the People's motion to mask the identities of witnesses and also from four proceedings to determine whether the courtroom should be closed to protect witnesses' identities (100 NY2d 129, 132-133 [2003]). Where substantive issues for trial are being discussed, the Court stressed that "ex parte hearings are not to be granted lightly

and are unwarranted and impermissible in the vast majority of cases" (id. at 134).

In People v Vargas, this Court upheld the exclusion of defense counsel from a conference to discuss a potential juror's fear of the defendant prior to voir dire (88 NY2d 363 [1996]). There, the trial court evaluated the juror's fear for his safety outside the presence of defense counsel and found it to be genuine (see id. at 379). In People v Castillo, an informant's fear justified the court's ex parte proceeding to determine whether to disclose the informer's identity or statements (80 NY2d 578, 586 [1992], cert denied 507 US 1033 [1993]).

In People v Ortega, the trial court held a conference properly described as an in camera proceeding by the Appellate Division to request that a prosecution witness identify a confidential informant (78 NY2d 1101, 1102 [1991]). The proceeding was closed to defense counsel and all parties, and no record was taken "to show what was said in chambers or whether it contributed to the court's decision that disclosure was not required" (78 NY2d at 1102-1103). Because the witness may have "stated an unrebutted view of the facts which influenced the [t]rial [c]ourt in reaching its subsequent decision," the Court found the inquiry violated defendant's rights (id.). In Kentucky v Stincer, the United States Supreme Court permitted the exclusion of the defendant from a proceeding testing the competency of two child witnesses in a sexual abuse case, holding

that the exclusion did not violate the Confrontation Clause (482 US 730, 739-744 [1987]).  Critically, defense counsel was present at the proceeding, asked questions, and the proceeding was transcribed, which allowed defense counsel to repeat the same questions during cross examination at trial (id. at 740).

"[S]ince most constitutional rights are not self-executing, the right to counsel may be the most basic of all" (People v Hodge, 53 NY2d 313, 317 [1981]).  "[I]n criminal cases in particular we have called for the highest degree of vigilance in safeguarding the right of an accused to have the assistance of an attorney at every stage of the legal proceedings against him" (id. at 317-318 [quotation marks and citation omitted]).  In Hodge, the trial court insisted that the defendant proceed without retained counsel where defense counsel had not arrived "after adequate time" to a preindictment preliminary hearing (id. at 316-317).  The People asserted there that because the defendant was subsequently indicted, there was no harm and "any infirmities that occurred at the flawed hearing may be excused" (id. at 319).  This Court responded that "the test must be not what the hearing did not produce, but what it might have produced if the defendant's right to counsel had not been ignored" (id. at 321).  "[T]he result of such inquiry would have to be pure speculation" (id.).

The denial of the right to counsel at trial "is of constitutional dimension" and is not subject to harmless error

analysis (Hodge, 53 NY2d at 320; People v Hilliard, 73 NY2d 584, 587 [1989]). Courts should not delve into questions of prejudice when assistance of counsel is involved (see People v Felder, 47 NY2d 287, 291 [1979]; Perry v Leeke, 488 US 272, 280 [1989]). As this Court recognized, "[t]he right to have the assistance of counsel is too fundamental and absolute to allow courts to indulge in nice calculations as to the amount of prejudice arising from its denial" (Felder, 47 NY2d at 296 [quotation marks and citation omitted]). And as this Court held in Hodge, a quantification of what impeachment material defense counsel might have obtained at the proceeding cannot be dispositive (see 53 NY2d at 321), as harmless error does not apply in right-to-counsel cases (see 488 US at 280).

Here, the in camera proceeding clearly involved substantive issues as opposed to ministerial matters and there was no justification for excluding defense counsel. Because the discussion involved important issues for trial that might have affected a "substantial right" of a party, defense counsels' presence was required (see Rules Governing Judicial Conduct [22 NYCRR] § 100.3 [B] [6] [a]; Contreras, 12 NY3d at 273; Goggins, 34 NY2d at 173]). Mr. Rose was the People's star witness. When he failed to appear the first time, the People dispatched investigators to look for him. He then appeared, two hours late, after which the trial judge interviewed him in camera without counsel present, describing his appearance later as "tired,"

"disheveled," and "hyper."  When the trial judge conveyed the content of his conversation to the defense attorneys, they all requested to be present if and when the court interviewed the witness again regarding his potential future absences.  Indeed, they had a very good reason to suspect that the witness's absences were caused by his use of crack cocaine and methadone, which could potentially constitute impeachment material critical to defendants' ability to defend.  That request was denied.  When the witness failed to appear on the next court date, the judge again interviewed him in camera and observed that he was in no condition to testify.  The record belies the People's contention that the second proceeding was a simple meeting to discuss scheduling.  By the second interview, it was no longer a mere scheduling matter.  The proceeding involved what caused Mr. Rose to be in such "bad shape" that he failed to testify twice. Unlike a "purely administrative, ministerial question" (see dissenting op., at 3), the court's discussion with Mr. Rose concerned potentially significant evidence that defense counsel may have found useful during cross-examination at trial.  The trial court should have been alerted to this possibility based on Mr. Rose's suspicious and questionable appearance and demeanor, of which the court took note, when he arrived several hours late on the first day that he was scheduled to testify.  Indeed, the court knew that there was serious reason to doubt the veracity of Mr. Rose's migraine explanation because the court asked him

whether he was "on drugs," "suffering from any alcohol problem," or was "on crack."

As this Court held in <u>Contreras</u> and <u>Goggins</u>, courts should rarely exclude defense counsel from a proceeding with a witness where the court has reason to believe that the matter falls outside of the permissible ex parte communications for scheduling and administrative purposes, as it did here (<u>see</u> 12 NY3d at 273; 34 NY2d at 173).  If the dissent's characterization of the in camera discussion were correct -- had the discussion been merely about scheduling -- the Rules of Judicial Conduct authorizing ex parte communications for scheduling or administrative matters would apply, and the trial court would have been acting within its discretion to manage its docket.  As the in camera discussion concerned a witness's health (both mental and physical) and credibility, issues the court knew defense counsel would address during cross-examination of the witness at trial, it was much more than a scheduling matter, and it violated defendants' right to counsel for Supreme Court to deny defense counsel physical access to the proceeding and to refuse to create a record of the proceeding for use in cross-examination (<u>see</u> <u>Contreras</u>, 12 NY3d at 273; <u>Goggins</u>, 34 NY2d at 173; <u>Frost</u> 100 NY2d at 134; <u>Ortega</u>, 78 NY2d at 1102; <u>Stincer</u>, 482 US at 745).

Accordingly, in each case, the order of the Appellate Division should be reversed and a new trial ordered.

People v Lee Carr; People v Walter Cates, Sr.

Nos. 26 & 27

FAHEY, J. (dissenting):

The trial court conducted an in camera interview with a prosecution witness to ascertain whether his migraine was too debilitating for him to testify that day. The court granted an adjournment, for a second time, and the witness testified the next day. Now, the majority, holding that this was reversible error, grants defendants a new trial, because the interview "concerned potentially significant evidence that defense counsel may have found useful during cross-examination at trial" (majority op at 11). In my view, the in camera inquiry here was permissible because it was merely ministerial. Accordingly, I dissent.

Initially, I agree that it is appropriate for the Court to consider precedents concerning ex parte hearings here, because the in camera questioning of the witness occurred after the prosecutor called the trial judge to inform him that the witness was in her office but in no condition to testify, and it took place in the absence of defense counsel. However, the majority strays far from those precedents. In People v Frost (100 NY2d 129 [2003]), in which we upheld the closure of a courtroom following an ex parte proceeding, we simply observed that "ex

- 1 -

parte hearings are not to be granted lightly and are unwarranted and impermissible in the vast majority of cases" (id. at 134). We noted that avoidance of ex parte hearings, while not always required, is "the better practice" (id.). More recently, we have stated that "ex parte proceedings are undesirable, and they should be rare" (People v Contreras, 12 NY3d 268, 273 [2009]). Until today, we simply recommended that ex parte hearings remain rare; now, for the first time, a showing of "substantial justification" (majority op at 6) is required.

This Court has never held that conducting an in camera inquiry on a scheduling matter violates a defendant's right to counsel. In fact, it tries to avoid that conclusion today, by limiting its holding to in camera or ex parte inquiries "about non-ministerial matters" (majority op at 6). No party has the right to control the scheduling of litigation. That is the court's prerogative. Preventing trial courts from controlling the scheduling of witnesses in camera will interfere with a court's exercise of its discretion to oversee the management of a trial and ensure its fair and orderly conduct. Indeed, the Rules of Judicial Conduct expressly state that

> "[e]x parte communications that are made for
> scheduling or administrative purposes and
> that do not affect a substantial right of any
> party are authorized, provided the judge
> reasonably believes that no party will gain a
> procedural or tactical advantage as a result
> of the ex parte communication, and the judge,
> insofar as practical and appropriate, makes
> provision for prompt notification of other
> parties or their lawyers of the substance of

the ex parte communication and allows an
opportunity to respond" (22 NYCRR 100.3 [B]
[6] [a]).

Here, notably, the trial court complied with 22 NYCRR 100.3,
promptly placing detailed information on the record about what
had occurred at the ex parte inquiry, and ensuring that defense
counsel was subsequently able to cross-examine the witness
extensively on matters relating to his credibility.

No guidance is offered to trial courts as to when a
matter qualifies as ministerial.  The in camera inquiry in the
present case involved questioning on a purely administrative,
ministerial question: whether a witness was so ill, from a
migraine, that he would be unable to testify on a particular day.
As the Appellate Division noted, the trial court's "inquiry was
not a hearing, nor part of the trial, and it did not involve the
determination of any issue requiring input from defendant or his
counsel" (People v Carr, 111 AD3d 472 [1st Dept 2013]).  The
inquiry simply resulted in a witness's appearance being delayed
from one day to the next.  If this interview was not ministerial,
then nothing is.

The attempt to defend classification of the trial
court's interview as non-ministerial by postulating that it
"concerned potentially significant evidence that defense counsel
may have found useful during cross-examination at trial"
(majority op at 11) fails because this may be said of any request
for adjournment.  Whenever one party seeks rescheduling of a

witness's testimony, there is a <u>potential</u> that an inquiry into the reasons will reveal information that the other party "may" find "useful."  This test is so weak that it is no test at all.

Competent counsel will now invariably argue that a scheduling matter is not ministerial and that his or her client has a right to know why the witness claims to be unable to testify.  This will occur even when the witness's indisposition relates to a trivial, personal and private condition.  This decision creates a standard that will be impossible to administer.  Commonly, the trial court will be forced to hold a full-blown hearing to decide a matter that demands quick resolution.  All parties to criminal litigation – not just the prosecution but defendants as well – will suffer from this cumbersome new process.

I would affirm the order of the Appellate Division in each case.

*   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *   *

<u>For Cases No. 26 and No. 27</u>:  Order reversed and a new trial ordered.  Opinion by Chief Judge Lippman.  Judges Read, Rivera, Abdus-Salaam and Stein concur.  Judge Fahey dissents in an opinion in which Judge Pigott concurs.


Decided April 2, 2015